Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 18 2014, 8:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SEAN P. HILGENDORF**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JOSEPH WAYER,                                  )
                                               )
    Appellant-Defendant,                      )
                                               )
        vs.                               )    No. 71A03-1310-CR-415
                                               )
STATE OF INDIANA,                              )
                                               )
    Appellee-Plaintiff.                       )

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Elizabeth C. Hurley, Judge
Cause No. 71D08-1202-MR-4

**September 18, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Joseph Wayer appeals his conviction for murder. We affirm.

**Issue**

The sole issue before us is whether there is sufficient evidence to support Wayer's conviction.

**Facts**

Wayer was married to Barbara Sheppard, and they had two children. In February 2011, Barbara filed for divorce. Barbara was granted provisional custody of the children. Wayer reacted very poorly to the filing. He was held in contempt for failing to pay provisional child support while the dissolution action was pending and frequently missed scheduled hearings. He threatened to post nude photos of Barbara on the internet, and then in fact did so. Wayer also threatened to give Barbara's address to an ex-boyfriend of hers named Ramiro who previously had broken into her house and attempted to rape her. Wayer sent a number of threatening messages to Barbara through Facebook and also made threatening phone calls to her. In one Facebook message, Wayer told Barbara that Ramiro was going "to help me get my kids back. I can't say how but . . . he's promised I'll never have to worry about child support or custody again because He has a score to settle with you." Ex. 115. In another message, again referring to Wayer giving Barbara's address to Ramiro, Wayer wrote, "Whenever 'IT' happens . . . I want you to think that maybe you shouldn't have done what you did to me. . . . I'll make sure the kids remember you fondly. Please try and pack their stuff so when 'IT' happens I can move them out quickly." Ex. 116.

On December 19, 2011, a final dissolution decree was entered in which Barbara was granted custody of the children, and Wayer was denied any visitation with them. A copy of the order was mailed to Wayer the next day.

On December 22, 2011, Barbara finished working her shift at a tobacco store in South Bend at about 8:00 p.m. Security cameras show Barbara leaving the store, but she never got in her car. At about 8:15 p.m., a customer at a gas station across the street from the tobacco store thought he heard three screams coming from the area of the store. He briefly looked around the area but did not see anything and left. A customer of the tobacco store also described hearing a strange female sound coming from behind the store that evening, which he thought might have come from neighbors "going at it." Tr. p. 489. Barbara's fiancé became concerned when she did not come home from work and called police to report her missing. An officer looked around the tobacco store but did not go behind the store. He found nothing unusual.

Finally, Barbara's fiancé went looking for her himself after 1:00 a.m., and he found her dead in an alley behind the tobacco store. She had been stabbed or cut at least fourteen times, including having her right jugular vein cut open. Police recovered various items and pieces of evidence from and around Barbara, including human hairs found on her shirt and on her right hand, stuck to some dried blood. The location of the hairs in Barbara's right hand was consistent with the hairs having been pulled from the murderer during a struggle. Barbara's engagement ring was missing, but none of her other belongings were missing.

3

Wayer had no abili for his whereabouts between 6:45 p.m. and 9:00 p.m. on December 22, 2011. Wayer's mother returned to her house, where Wayer was staying, at around 9:00 p.m., and Wayer was there. It is approximately a twenty-five minute drive to Wayer's mother's house from the tobacco store.

Indiana State Police analyst Rebecca Tobey performed DNA testing on the various items recovered from the crime scene and the results were compared with samples obtained from Barbara, Wayer, Barbara's fiancé, and a third man. DNA testing of Barbara's fingernails revealed primarily only Barbara's DNA, with some fragments of other unidentifiable DNA. A hair collected from Barbara's shirt was found to contain a mixture of two people's DNA. The mixture would have occurred if the hair was covered in a different person's blood and it is not possible to test whether DNA came from hair or blood. Tobey could not exclude Barbara and Wayer as possible contributors to the DNA mixture. She also estimated that the possibility that a random individual unrelated to Barbara or Wayer could have contributed to this DNA mixture was 1 in 31,000 for the Caucasian population, 1 in 50,000 for the African American population, and 1 in 45,000 for the Hispanic population. Tobey also found a mixture of two people's DNA from a hair collected from Barbara's bloody right hand, from which Barbara and Wayer could not be excluded as contributors. For this sample, Tobey was able to calculate that the possibility of a random individual unrelated to Barbara or Wayer contributing to this mixture was 1 in 27 million for the Caucasian population, 1 in 1.1 billion for the African American population, and 1 in 110 million for the Hispanic population. In cases of DNA mixtures, analysts are not able to definitively state that one particular individual was a

4

DNA contributor. In cases involving single DNA samples, an analyst will not state with certainty that DNA belongs to a specific individual unless there is at least a 1 in 330 billion chance that another random individual could have matched the sample, in the absence of an identical twin. Tobey was also of the opinion that Wayer and Rebecca's children were not possible contributors to either of the DNA mixtures she tested, due to the number of alleles she observed.

The State charged Wayer with murder. After a five-day jury trial, Wayer was convicted as charged and sentenced accordingly. He now appeals.

**Analysis**

When we review a claim of insufficient evidence to support a conviction, we must consider only the evidence most favorable to the conviction and any reasonable inferences that may be drawn from that evidence. Baker v. State, 968 N.E.2d 227, 229 (Ind. 2012). We will affirm if a reasonable fact finder could determine from the evidence that the defendant was guilty beyond a reasonable doubt. Id. We will not reweigh the evidence or judge the credibility of witnesses. Id.

In this case, there is a lack of direct evidence of Wayer's guilt. A conviction for murder may be sustained entirely on circumstantial evidence of guilt. Maul v. State, 731 N.E.2d 438, 439 (Ind. 2000). On appeal, we need not decide whether the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, so long as inferences may reasonably be drawn from the evidence to support the conviction beyond a reasonable doubt. Klaff v. State, 884 N.E.2d 272, 274-75 (Ind. Ct. App. 2008). The recovery of a defendant's DNA from a murder victim is direct evidence of the defendant

5

having been in the victim's presence at some time but is circumstantial with respect to whether the defendant committed the murder. See Hampton v. State, 961 N.E.2d 480 (Ind. 2012). "Even though one's mere presence at the crime scene with the opportunity to commit a crime is not a sufficient basis on which to support a conviction, one's presence at the scene in connection with other circumstances tending to show one's participation may raise a reasonable inference of guilt." Klaff, 884 N.E.2d at 275.

Wayer wishes to focus our attention on the evidence that is lacking in the present case: the lack of any incriminating statements by Wayer, the lack of fingerprint or eyewitness evidence, the lack of recovery of a murder weapon, and the lack of recovery of any evidence from Wayer's person or thereabouts connecting him to Barbara's death. On appeal, however, our focus is not on what evidence is lacking, but on what evidence supports the conviction. "In reviewing sufficiency claims, we look at what evidence was presented to the jury, not at what evidence was not presented." Meehan v. State, 7 N.E.3d 255, 259 (Ind. 2014). This case bears some similarities to Meehan. In that case, a conviction for burglary was sustained on appeal where the only evidence was that a glove containing the defendant's DNA was found at the scene of the crime near the point of entry, that the defendant lacked permission to be in the building, and that the defendant was found to be in possession of possible burglary tools several months after the burglary occurred. Id.

Here, Wayer—along with Barbara—could not be excluded as a possible contributor of DNA to a mixture of two people's DNA found in two different locations on Barbara's body. Wayer makes much of Tobey's refusal to definitively state, to a

6

degree of scientific certainty, that Wayer was a contributor to the DNA mixture. However, the standard for making such a statement is very high and, according to Tobey, is not done in cases involving DNA mixtures. Focusing on the DNA found on Barbara's right hand, Tobey indicated in her testimony that there was at best a 1 in 27 million chance that a random person other than Wayer or Barbara could have contributed to the DNA mixture. That is a high degree of certainty that Wayer's DNA was present. In any event, "[t]hat the DNA match may not be absolute goes to the weight and credibility of the evidence." Hampton, 961 N.E.2d at 494.

Wayer also asserts that Tobey could not definitively exclude one of Barbara and Wayer's children as a DNA contributor—i.e., he essentially posits that some of their children's hairs could have gotten on Barbara and skewed the DNA results. Tobey, however, excluded this possibility in her testimony. She explained that each person inherits two alleles at each DNA locus—one from each parent. Thus, each of Barbara and Wayer's children would have one allele from Barbara and one from Wayer at each DNA locus. Tobey further explained that in examining the DNA mixtures, she observed the presence of four distinct alleles at the DNA loci she tested, indicating the presence of two unrelated persons; whereas, if one of the parties' children had been a contributor to the mixture, there would have been only three distinct alleles because there would have been two overlapping identical alleles, one from a parent and one as inherited by a child.

Wayer further insinuates that his DNA, through one of his hairs, could have been transferred to Barbara at an earlier date. Despite some testimony that this could be possible in theory, the last time that Wayer saw Barbara in person was in April 2011, or

7

seven months before her murder. Also, the pathologist who examined Barbara and collected the hair samples from her right hand testified that it was suggestive of hair being pulled from her assailant during the attack. In other words, the evidence most favorable to the conviction supports the reasonable inference that Wayer's DNA was in fact on Barbara's person. It is further reasonable to infer that it was transferred to Barbara's person during the stabbing that killed her. For us to conclude otherwise would constitute improper reweighing of the evidence.

In addition to the DNA evidence, there was evidence of the highly acrimonious divorce proceedings between Wayer and Barbara, complete with threats against Barbara, some of which can be read as implied death threats. To be sure, the threats used the specter of Barbara's ex-boyfriend Ramiro as the person who would harm her, and there is no evidence Ramiro in fact killed her. Still, the jury could consider Wayer's threats as evidence of his violent hostility toward Barbara. The divorce, which resulted in Barbara being granted custody of the children and Wayer having no visitation with them, became final just three days before Barbara's murder. Again, the jury was not required to find the timing of Barbara's murder to be purely coincidental and, instead, could give it relevance. There was no evidence that Barbara was sexually assaulted or that Barbara's attack was motivated by financial reasons. Indeed, the only piece of personal property that was missing following her death was her engagement ring. It is not an unreasonable stretch of the imagination to infer that the person who would want to take only this ring would be Barbara's jilted ex-husband. Finally, Wayer had no alibi for his whereabouts at the time of Barbara's killing, and it was entirely possible for him to kill her at approximately 8:15

8

p.m., dispose of any evidence, and make the twenty-five minute drive back to his mother's house before she arrived home around 9:00 p.m. Wayer argues that his cellphone records do not place him at the scene of the murder at any time, but even if Wayer's cellphone was not present at the scene, that does not mean Wayer himself was not there. In sum, the circumstantial evidence in this case—including the DNA evidence—supports the jury's conclusion that Wayer murdered Barbara.

## Conclusion

There is sufficient evidence to support Wayer's conviction for murder. We affirm.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.